1   John A. McGuinn, Esq. (State Bar No. 036047)
2   Sharon R. Vinick, Esq. (State Bar No. 129914)
    Noah D. Lebowitz, Esq. (State Bar No. 194982)
3   McGUINN, HILLSMAN & PALEFSKY
    535 Pacific Avenue
4   San Francisco, CA 94133
    Telephone:   415/421-9292
5   Facsimile:   415/403-0202

6   Attorneys for Plaintiff
7   ANNE McCOLLUM

8

ENDORSED
F I L E D
San Francisco County Superior Court

APR 2 4 2001

GORDON PARK-LI, Clerk
BY:   MONICO SD. MATEO, JR.
Deputy Clerk

J. GOMEZ-WONG

PLAN I  10:00 A.M.

STATUS CONFERENCE DATE: SEP 2 8 2001

9               SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                        COUNTY OF SAN FRANCISCO

11

12   ANNE McCOLLUM,                          Case No. **820716**

13               Plaintiff,                  COMPLAINT FOR BREACH OF CON-
                                             TRACT; BREACH OF THE COVE-
14        vs.                                NANT OF GOOD FAITH AND FAIR
                                             DEALING; VIOLATION OF LABOR
15   XCARE.NET, INC., and DOES 1 – 5,        CODE § 220, ET SEQ.; VIOLATION O
16   inclusive,                              CALIFORNIA BUSINESS & PROFES-
                                             SIONS CODE § 17200, ET SEQ.;
17               Defendants.                 WRONGFUL TERMINATION IN VIOLA
                                             TION OF PUBLIC POLICY; AND
18                                           DECLARATORY RELIEF [CALIFORNI
19                                           CIVIL CODE § 1060

20                                           *Unlimited Jurisdiction: Damages in
21                                           Excess of $25,000*

22                                           **JURY TRIAL DEMANDED**

23

24        Plaintiff complains and alleges as follows:

25                              PARTIES

26        1.   At all material times plaintiff Anne McCollum ("plaintiff" or "McCollum")

27   was a resident of the State of California. The employment contract upon which she

28   sues herein was performed in the State of California, including the County of San

McGUINN, HILLSMAN
& PALEFSKY

1  Francisco.

2      2.    XCare.net, Inc. ("XCare.net") is a Colorado corporation doing business in

3  the State of California, including the County of San Francisco.

4      3.    The true names and capacities of the defendants named herein as Does

5  1 through 5, inclusive, whether individual, corporate, associate or otherwise, are

6  unknown to plaintiff, who therefore sues such defendants by fictitious names pursuant

7  to Code of Civil Procedure § 474. Plaintiff is informed and believes that one or more of

8  the Doe defendants are California residents. Plaintiff will amend this complaint to show

9  such true names and capacities when they have been determined. Each defendant

10  was an agent, employee or representative of the other defendants and ratified the

11  conduct of the other defendants.

12

13              **FACTS COMMON TO ALL CAUSES OF ACTION**

14

15      4.    McCollum has more than fifteen years of high-level experience in sales

16  and marketing in the health care industry, including the integration of Internet

17  technology into the health care industry. Over that time span, McCollum has worked for

18  several of California's health care industry leaders. She has consistently surpassed

19  employer-set goals and attained awards for her performance.

20

21      5.    XCare.net is in the business of providing strategic eBusiness portals and

22  business-to-business Internet solutions for the healthcare industry.

23      6.    In the Spring of 2000, McCollum was interviewed for a position with

24  XCare.net by Laurie Hellmann (at the time the Senior Director of Sales) and Tom

25  Planko (the Executive Vice President of Sales and Marketing).

26      7.    McCollum interviewed with Hellmann at a hotel in San Francisco,

27  California. During her interview with Hellmann, McCollum was told that she would be

28

McGUINN, HILLSMAN
& PALEFSKY

1   perfect fit for XCare.net due to her substantive experience in the health care industry

2   and her professional relationships with potential clients of XCare.net. Specifically,

3   Heilmann indicated that XCare.net was initiating sales contact with a company with

4   whom McCollum had worked and that her knowledge of that company and the people

5   in that company, would prove extremely valuable for XCare.net. Heilmann also told

6

7   McCollum that XCare.net had more business than it could handle and McCollum could

8   expect to make in excess of $200,000 in her first year. In discussing McCollum's

9   potential compensation, Heilmann told her that the "sky's the limit" (*i.e.*, there was no

10   cap on her commissions). ·

11       8.     McCollum interviewed with Pianko at the company's headquarters in

12   Colorado. During that interview Pianko reiterated much of what Heilmann had told

13

14   McCollum. Pianko also revealed that the former employer that Heilmann had

15   referenced was Foundation Health Services ("FHS"). FHS was located in Marin

16   County, California. Both McCollum and Pianko agreed that her prior professional

17   relationship with Gary Velasquez (as ratified by Velasquez' glowing job

18   recommendation for McCollum) made her the ideal candidate for the position.

19       9.     After her interviews, McCollum submitted a list of references consisting of

20

21   former employers, colleagues, and clients. McCollum later learned from Pianko that

22   one of her strongest recommendations came from Gary Velasquez, the President/CEO

23   of New Ventures Group at Foundation Health Services.

24       10.     McCollum was hired by XCare.net in June 2000 as the Sales Director

25   eHealth Solutions for the company's designated Western Region.

26       11.     On June 16, 2000, XCare.net sent McCollum a letter detailing the terms

27

28   and conditions of its offer of employment to McCollum (hereinafter referred to as "Offer

McGUINN, HILLSMAN

Letter"). A true and correct copy of the Offer Letter is attached hereto as Exhibit A.
McCollum signed the Offer Letter, signifying her acceptance of the offer, on June 21,
2000 while at her home in Walnut Creek, California. McCollum began working for
XCare.net on July 5, 2000.

12.    The Offer Letter detailed McCollum's rate of compensation. Among other
things, the Offer Letter stated, "[y]ou also will be eligible to earn sales commissions
under XCare.net's 2000 Sales Compensation Plan [sic]." A true and correct copy of the
2000 Sales Incentive Compensation Plan, executed by McCollum, is attached hereto as
Exhibit B. McCollum executed the 2000 Sales Incentive Compensation Plan in
California.

13.    With XCare.net's full knowledge and approval, for the entirety of her
employment with XCare.net, McCollum worked exclusively from her home office in
Walnut Creek, California.

14.    McCollum's first task with XCare.net was to negotiate a contract with FHS.
That contract was valued at approximately $1.3 million. Prior to McCollum's
involvement, there had been no significant contract negotiations.

15.    McCollum's first task in regard to the FHS contract was to attend a
meeting with Velasquez in Marin County, California. McCollum, along with Heilmann,
Pianko, and Afshin Cangarlu (the General Manager of the West Coast for XCare.net
who was based in Los Angeles, California), met with Velasquez to engage in
substantive contract negotiations.

16.    At that meeting, Velasquez for the first time articulated his vision of a
broad ranging technology partnership between FHS and a third-party like XCare.net.
This technology partnership vision would supplant the $1.3 million contract in favor of a

1   much larger, more involved relationship between the two companies.

2       17.    In response to Velasquez' comments, McCollum immediately drafted a

3   technology partnership proposal. Within 24 hours, McCollum had drafted and

4   circulated a framework for this new contract. This contract, if executed, would be worth

5   between $10 - $15 million in revenue to XCare.net, over a two year period.

6

7       18.    Velasquez stated that McCollum's proposal was precisely what he had

8   envisioned. Thus, XCare.net and FHS ceased negotiations on the $1.3 million contract

9   and started new negotiations to finalize this much broader technology partnership.

10       19.    McCollum was in charge of the negotiations on behalf of XCare.net for the

11   technology partnership contract. All along the process, McCollum received praise and

12   encouragement from Heilmann, Pianko, and FHS personnel for her performance in

13

14   formulating the technology contract and driving the contract to its final form.

15       20.    On October 10, 2000, as the FHS contract negotiations were reaching

16   their final stage, McCollum received a telephone call and email from Heilmann telling

17   her to cease having any contact with FHS. Heilmann's email stated that she had

18   received "several complaints from both inside [FHS] and your colleagues." Heilmann's

19   email went on to state: "I have given you the choice of accepting a performance

20   improvement plan which will outline in detail numerous performance related issues over

21

22   the past few months or work out a mutually acceptable transition plan." Under either

23   plan, McCollum would be immediately removed from the FHS account.

24       21.    In the October 10 telephone conversation, McCollum and Heilmann

25   discussed the terms of the transition plan that Heilmann proposed. Under this option,

26   McCollum would have thirty days to transition her existing accounts to other sales

27   representatives and conduct a job search for herself.

28

22.   Prior to October 10, 2000, no one at XCare.net had ever communicated to McCollum that there had been any complaints, either from inside XCare.net or from clients, about her. On the contrary, to that point McCollum had only received compliments regarding her performance. McCollum is informed and believes and thereon alleges that XCare.net never received any complaints about her performance from FHS.

23.   On October 11, 2000, McCollum called Heilmann and accepted the offer for a "mutually acceptable transition plan." Based on Heilmann's representations, McCollum understood that a transition plan would allow her to remain employed with XCare.net for a period of thirty days.

24.   On October 11, 2000, McCollum called Pianko to inquire as to the reasons for her removal from this highly profitable FHS account and for specific instances of her alleged "numerous performance related issues over the past few months." Pianko did not cite any specific complaints from anybody, or describe any specific problems with McCollum's performance. In fact, Pianko told McCollum that she should be proud of her relationships with FHS and that she should rest assured that he reputation with FHS remained intact. Pianko then labeled the reason for this adverse employment action as a "personality conflict" between McCollum and Heilmann. McCollum also told Pianko that she had accepted Heilmann's offer to draw up a transition plan. At no time during this conversation with Pianko did McCollum ever offe her resignation. At no time did McCollum intend to resign her position with XCare.net.

25.   Without notice, on October 13, McCollum received a proposed Resignation Agreement and General Release (*i.e.*, proposed severance package) from XCare.net's Director of Human Resource, Robin Orr. This proposed agreement stated

1   that, effective October 13, McCollum had resigned her position. Upon receipt,

2   McCollum telephoned Orr and told her that she had never offered her resignation.

3   McCollum explained that she had accepted Heilmann's offer of a mutually acceptable

4   transition plan that would span thirty days.

5       26.     On October 16, 2000 McCollum received an email from Heilmann asking

6   for her proposal for the mutually agreeable transition plan. Later in that same week,

7   two other XCare.net sales representatives called McCollum to get information regarding

8   her accounts that were being transferred to them.

9   

10      27.     In an email to McCollum dated October 19, 2000 Orr stated "your

11  employment was terminated on the 13th." In reply, McCollum sent an email to Orr,

12  again stating that she had never offered her resignation, nor had she intended to cease

13  her employment with XCare.net prior to the end of the thirty-day transition period.

14  

15      28.     From on or about October 10, 2000 through the end of October,

16  McCollum continued to receive communications from FHS regarding specific issues

17  concerning the contract and new business opportunities.

18      29.     McCollum later learned that the XCare.net - FHS technology partnership

19  contract was signed less than thirty days after McCollum was removed from the

20  account.

21  

22      30.     On October 31, 2000, McCollum sent a letter to Orr (via email and FedEx)

23  in response to the draft severance agreement. McCollum detailed the events

24  surrounding her removal from the FHS account. McCollum reiterated that she had

25  never submitted her resignation. McCollum asked whether she would be receiving the

26  commissions due her for the FHS technology partnership contract under the terms of

27  the 2000 Sales Incentive Compensation Plan. As she had never resigned, nor had she

28

1 ever begun the thirty-day transition period in which she would be moved into other

2 accounts, McCollum said that she was still due the commissions from the technology

3 partnership contract.

4    31.   On November 8, 2000, XCare.net and FHS issued a press release

5 announcing the newly formed partnership between the two companies.

6    32.   McCollum believes that, under the terms of the 2000 Sales Incentive

7

8 Compensation Plan, had she been permitted to remain on the account, her

9 commission from the technology partnership contract would have been in excess of

10 $450,000, for a two year contract. McCollum believes that XCare.net terminated her

11 employment in order to evade paying her the substantial commissions that she had

12 earned.

13

14
                    **FIRST CAUSE OF ACTION**
                      **Breach of Contract**

15    33.   By this reference plaintiff incorporates ¶¶ 1 through 32 as though fully set

16 forth herein.

17

18    34.   McCollum and XCare.net entered into an employment contract which was

19 partially written and partially oral. McCollum's rate of compensation was detailed in the

20 Offer Letter and the 2000 Sales Incentive Compensation Plan. Each of these

21 documents were signed by McCollum in California. McCollum performed her

22 obligations under her employment contract in California.

23    35.   Under the terms of XCare.net's 2000 Sales Incentive Compensation Plan

24

25 McCollum was eligible to receive commissions on all contracts that she worked, so lon

26 as those contracts were finalized while McCollum continued to work on the account.

27    36.   On October 11, 2000, defendants told McCollum that she was being

28 removed from the FHS account. Defendants also terminated McCollum's employment

McGUINN, HILLSMAN

1    as of October 13, 2000. As a direct result of defendants' action, McCollum was

2    deprived of the opportunity to earn a sizeable commission on FHS technology

3    partnership contract.

4        37.    McCollum has performed all the covenants, conditions, and obligations

5    that were under her control as part of the contract.

6        38.    As a direct and proximate result of defendants' breach of contract,

7

8    McCollum has suffered damages in a sum in excess of the jurisdictional limits of the

9    Superior Court.

10        WHEREFORE, plaintiff prays for judgment as set forth below.

11                    **SECOND CAUSE OF ACTION**
12              **Breach of the Covenant of Good Faith and Fair Dealing**

13        39.    By this reference plaintiff incorporates ¶¶ 1 through 38 as though fully set

14    forth herein.

15        . 40.    McCollum's contract with XCare.net as embodied, *inter alia*, in the 2000

16    Sales Incentive Compensation Plan and the Offer Letter, contained an implied-in-law
17

18    covenant of good faith and fair dealing that neither party would do anything to injure the

19    right of the other party to enjoy the actual benefits of that contract.

20        41.    McCollum's contract with XCare.net provided for McCollum to receive

21    commissions on her sales as part of her employment compensation. The 2000 Sales

22    Incentive Compensation Plan set forth the terms of the benefit that McCollum was to

23    receive as commission on her sales.

24
25        42.    In removing McCollum from the FHS account and terminating her

26    employment, defendants prohibiting McCollum from recovering a sizeable commission

27    under the 2000 Sales Incentive Compensation Plan. Defendants removed McCollum

28    from the FHS account and terminated her employment as a pretext to cheat her out of

McGUINN, HILLSMAN
& PALEFSKY

1   the benefit of the 2000 Sales Incentive Compensation Plan.  In so doing, defendants

2   deprived McCollum of the opportunity to receive the actual benefits of her contract with

3   XCare.net, thereby violating the covenant of good faith and fair dealing and breaching

4   the contract.

5       43.    McCollum has performed all the covenants, conditions, and obligations

6
7   that were under he control as part of the contract.

8       44.    As a direct and proximate result of defendants' breach of the covenant of

9   good faith and fair dealing, McCollum has suffered damages in excess of the minimum

10   jurisdiction of the Superior Court.

11      WHEREFORE, plaintiff prays for judgment as set forth below.

12
     ///
13
                        **THIRD CAUSE OF ACTION**
14                    Violation of Labor Code § 200, et seq.

15      45.    By this reference plaintiff incorporates ¶¶ 1 through 44 as though fully set

16
17   forth herein.

18      46.    At the time of McCollum's termination, pursuant to the terms of the 2000

19   Sales Incentive Compensation Plan, she was entitled to commission on XCare.net's

20   venture with FHS.

21      47.    McCollum has demanded payment of the commissions from the FHS

22   contract, but defendants intentionally failed and refused to pay McCollum these sums.

23
        48.    Pursuant to Labor Code § 200, wages include periodic monetary
24
25   earnings, benefits and bonuses that are based upon work performed, including

26   commissions. .Pursuant to Labor Code § 201, If an employer discharges an employee,

27   the wages earned and unpaid at the time of discharge are due and payable

28   immediately, and in any event no later than 72 hours after the employee's discharge.

McGUINN, HILLEMAN
& PALEFSKY

                                                                              11

1  Pursuant to Labor Code § 203, if an employer willfully fails to pay any wages of an

2  employee who is discharged, the employee shall be entitled to a late payment penalty.

3      49.    Defendants intentionally failed and refused to pay McCollum her

4  commission which was owed to her. Pursuant to Labor Code §§ 201 and 203,

5  McCollum was entitled to her commission at the time of her discharge, is still entitled to

6

7  her commission, and is further entitled to a delayed payment penalty.

8      50.    Pursuant to Labor Code § 216, a willful failure to pay wages and

9  compensation that is due and owing is a misdemeanor. Defendants have an ability to

10  McCollum the compensation that is due and owing. By wrongfully failing to pay

11  McCollum for her commission, defendants have violated Labor Code § 216. As a

12

13  proximate result of defendants' violation of Labor Code § 216, McCollum has suffered

14  damages.

15      51.    Pursuant to Labor Code § 218.5, an employee who brings an action for

16  unpaid wages is entitled to an award of attorneys' fees. McCollum is entitled to

17  attorneys' fees due to defendants' failure to pay her commission at the time of her

18  termination.

19      WHEREFORE, plaintiff prays for judgment as set forth below.

20

21                    **FOURTH CAUSE OF ACTION**
   **Violation of California Business and Professions Code § 17200, et seq.**

22      52.    By this reference plaintiff incorporates ¶¶ 1 through 51 as though fully set

23  forth herein.

24

25      53.    Defendants, in committing the acts alleged in this Complaint, violated

26  Business and Professions Code section 17200 et seq. by engaging in unfair business

27  practices. Defendants' acts constituted dishonest, deceptive, oppressive, unfair and

28  destructive conduct.

McGUINN, HILLSMAN
& PALEFSKY

54.     Defendants' acts and omissions alleged hereinabove and hereinafter are unfair to McCollum and the general public in that Defendants have failed and continue to fail to provide their employees, like McCollum, with the benefits of their employment contracts.  Defendants have the ability to cease their unlawful business practices without any loss of business.  Defendants' conduct as alleged herein is severely harmful to their employees and has no benefit either the defendants or the general public.

55.     McCollum seeks injunctive relief requiring defendants to abide by their compensation agreements with their employees, including herself.  As a result of defendants' unfair actions as alleged herein, McCollum has no claim adequate or complete remedy at law as defendants continue to engage in such unfair practices, therefore, McCollum requests that defendants, their agents, employees and those acting in concert with defendants be permanently enjoined from engaging in the unlawful practices, policies and customs as set forth herein.

56.     The conduct of defendants constituted unlawful and unfair acts in violation of the California Business and Professions Code section 17200 et seq and on account thereof, McCollum is entitled to recover the expenses of this litigation, including but not limited to, reasonable attorneys' fees, for which defendants are liable to McCollum.  As a direct, foreseeable and proximate result of the unfair business practices of defendants, McCollum has suffered damages as set forth herein, and prays for judgment as hereinafter set forth.

WHEREFORE, plaintiff prays for judgment as set forth below.

### FIFTH CAUSE OF ACTION
### Wrongful Termination In Violation of Public Policy

57.     By this reference plaintiff incorporates ¶¶ 1 through 56 as though fully set

McGUINN, HILLSMAN
& PALEFSKY

1

1  forth herein.

2      58.    It is the public policy of the State of California to prohibit employers from

3  discharging employees in order to avoid paying commissions and wages to the

4  discharged employee. This public policy is embodied in, *infer alia*, the California Labor

5
6  Code, California Business and Professions Code, and the California Code of

7  Regulations.

8      59.    As set forth above, McCollum was the driving force behind the technology

9  partnership contract between FHS and XCare.net.  Pursuant to her employment

10 contract with defendants, McCollum was due a significant commission once the

11 technology partnership contract between XCare.net and FHS was signed.  As further

12 set forth above, in order to avoid paying commissions to McCollum, defendants

13
14 removed McCollum from the FHS account and terminated her employment.

15     60.    As a direct and proximate result of defendants' wrongful conduct,

16 McCollum has suffered damages including, but not limited to, a loss of income and

17 benefits, and has further suffered emotional distress and other general damages, all in

18 a sum in excess of the jurisdictional limits of the Superior Court.

19     61.    In doing the things alleged herein, defendants' conduct was despicable,
20
and defendants acted toward McCollum with malice, oppression, fraud, and with willful
21
22 and conscious disregard of McCollum's rights, entitling plaintiff to an award of punitive

23 damages.

24     WHEREFORE, plaintiff prays for judgment as set forth below.

25                    **SIXTH CAUSE OF ACTION**
26                Declaratory Relief (California Civil Code § 1060)

27     62.    By this reference plaintiff incorporates ¶¶ 1 through 61 as though fully se

28 forth herein.

McGUINN, HILLSMAN
& PALEFSKY

63.    In an effort to keep McCollum from collecting the commission that was due under the 2000 Sales Incentive Compensation Plan, defendants removed McCollum from the FHS account and terminated her employment.  Defendants took th adverse action under the false pretenses that XCare.net had received complaints abou McCollum and that she was a poor performer.

64.    Had defendants not removed McCollum from the FHS account or terminated her employment, she would have earned a commission which she believes to be in excess of $450,000.

65.    McCollum is informed and believes and thereon alleges that the reason defendants removed her from the FHS account and terminated her employment was t prevent her from collecting that commission.

66.    An actual controversy has arisen and now exists between McCollum and defendants concerning their respective rights and duties.

67.    Pursuant to California Civil Code § 1060, McCollum desires a judicial determination of her rights and duties and a declaration that she is entitled to paymen of full commission under the 2000 Sales Incentive Compensation Plan, including interest.

WHEREFORE, plaintiff prays for judgment as follows:

## PRAYER FOR RELIEF

1.    For general damages according to proof;

2.    For special damages according to proof;

3.    For penalties with respect to her Third Cause of Action (violation of Labo Code § 200 et seq.);

4.    For punitive damages with respect to her Fifth Cause of Action (wrongfu

1     termination in violation of public policy);

2     5.    For costs of suit;

3     6.    For a declaration that plaintiff is entitled to receive her full commission

4       under the 2000 Sales Incentive Compensation Plan;

5

6     7.    For reasonable attorneys fees;

7     8.    For interest at the maximum legal rate an all sums awarded; and

8     9.    For such other relief as the Court deems just and proper.

9    DATED:     April 23, 2001             McGUINN, HILLSMAN & PALEFSKY
                                            Attorneys for Plaintiff ANNE McCOLLUM

10

11

12

13                                  By:            NOAH D. LEBOWITZ

14

15                         **JURY TRIAL DEMANDED**

16

17

18

19

20

21

22

23

24

25

26

27

28

McGUINN, HILLSMAN
& PALEFSKY



June 16, 2000

Ms. Anne McColhim
181 Sequoia Avenue
Walnut Creek, CA 94595

Dear Anne:

This letter supercedes our offer letter dated June 13, 2000. I am pleased to confirm our offer to you of the position of Sales Director, reporting directly to Laurie Heilmann, Executive Director of Sales, West Area, at XCare.net based in Walnut Creek, California. Your start date will be on or before July 5, 2000.

Your annual salary of $85,000 is payable over twenty-six (26) pay periods. In addition, you will be eligible to receive a forgivable draw of $10,000 against future commissions, payable over your first twelve (12) pay periods. The draw is refundable in full to the company if you terminate your employment prior to 6 months of continuous service. You also will be eligible to earn sales commissions under XCare.net's 2000 Sales Compensation Plan. The first 90 days of employment will be considered an introductory period.

You are eligible to receive an option grant to purchase 2,000 common shares under the company's stock option plan. In terms of a vesting schedule, according to the stock option plan, 25% of your total options granted will vest upon the one-year anniversary date of your employment, and thereafter will vest monthly over a 36-month period on a *pro rata* monthly basis for the remaining 75% of the total options grant according to the terms of the plan.

The position is offered to you as a regular, full-time exempt employee. This letter is for your information and is not to be construed as a contract of employment, nor does it negate "employment-at-will" under Colorado law. By signing this letter, you authorize XCare.net, to the extent permitted by law, to deduct from final wages or other monies due you upon separation of employment, any financial obligations that you owe XCare.net. This offer is subject to a satisfactory check of references, academic credentials, professional designations and, if applicable, supplemental security checks.

In accordance with the Immigration Reform and Control Act, we are required to verify that you are legally entitled to work in the United States. Failure to present the appropriate document(s) on your start date will make you ineligible for employment with the Company. If you anticipate any difficulties in this regard, please let us know the circumstances as soon as possible so that alternate arrangements can be explored.

Upon meeting eligibility requirements, you will be able to participate in various benefits available through the XCare.net benefits package including vacation and sick leave, floating holidays, holiday leave. Medical, dental and vision coverage, a flexible benefits account plan, life insurance, short- and long-term disability, and participation in the Company's 401(k) plan are also included in the company's benefit package. These benefits will be explained to you during a regularly scheduled Company orientation.

Vacation leave will follow the schedule outlined in the Employee Handbook.

EXHIBIT A

# XCare.net
## 2000 Sales Incentive Compensation Plan
Anne McCollum

## GENERAL DEFINITIONS

### 1.1 Introduction
The XCare.net Sales Incentive Compensation Plan has been developed for the purpose of increasing company sales productivity, revenue and profitability. The plan accomplishes these objectives by providing financial incentives for Plan Participants to meet and exceed goals applicable to their respective positions.

### 1.2 Plan Objectives
Recognize and reward Plan Participants for their efforts associated with the production of the desired sales volume and margin.

Recognize and reward high-quality business transactions that enable revenue recognition by having the desired standard payment terms.

Recognize and reward maximum market share gains.

Maintain consistency between the efforts of the sales force and the overall objectives of XCare.net.

### 1.3 Plan Term
This plan is applicable for all standard XCare.net agreements that are signed and have a contract effective date between January 1, 2000 and December 31, 2000.

Subject to the provisions set forth below, standard XCare.net agreements that have been signed and have a contract effective date prior to January 1, 2000 will be paid according to the 1999 Sales Compensation Plan, or the plan in effect at the time the agreement was executed and accepted by XCare.net.

Except as expressly stated herein, this plan is exclusive of and supercedes any and all other prior or contemporaneous XCare.net plans, including without limitation any plans in place with any predecessors in interest to XCare.net.

### 1.4 Plan Administration

Senior management of XCare.net reserves the right to modify this plan, as they deem appropriate to handle unusual and/or unanticipated situations. Examples of this include: a situation where the Company goes at risk; shares risk with a customer; unusually large discounts are granted to win business; or a large transaction that requires significant company resources to close business. Any modifications to this plan, in order to be effective, must be documented in writing and signed by the Senior Vice President, Sales and Business Development.



EXHIBIT B

XCare.net reserves the right to modify or amend this Plan at any time without prior notice. Amendments, modifications or notices to this Plan will be issued in writing and shall be effective upon the date specified in the correspondence.

Interpretation of this Plan is at the sole discretion of XCare.net.

1.5 **Employment**

Plan Participant total compensation includes a salary and sales incentives as specified in this Plan.

Each Plan Participant (including Executive Director of Sales) must follow the procedures for regular updates to Goldmine and Critical Issues, as well as timely and accurate commission requests to their Executive Director of Sales.

If an employee terminates employment at XCare.net at any time prior to actual payment of a commission, unearned or otherwise deferred commission payments that have not been disbursed to Plan provisions will be forfeited. No commissions or bonuses are earned and will therefore, not be paid, on contracts IN Progress that have not been fully executed by the customer and XCare.net. Any unallocated quota or commission of a terminated employee cannot be relocated to another employee. All exceptions must be approved in writing by the Senior Vice President of Sales & Business Development and CFO. Notwithstanding anything else contained in the agreement, this provision applies to commissions payable under this or any prior plan.

1.6 **Territory Assignment**

Plan Participants will be assigned specific accounts, or territories and or channels in writing by their sales management team. XCare.net management reserves the right to exclude and/or reassign specific accounts, prospects, geographic areas or health care entities within an assigned territory based on superseding XCare.net objectives. Territory or account assignments are subject to change upon written notice from a Plan Participant's sales management team.

In the event of an internal XCare.net job, territory or account change, commission payments not yet due can follow the Plan Participant to their new job, when applicable, so long as it is agreed to in advance and documented in writing by the appropriate Executive Director of Sales, with approval from the Senior Vice President Sales & Business Development.

Plan Participants will receive quota credit only for sales within their assigned territory or account base. Exceptions must have prior written approval of the Senior Vice President of Sales.

1.7 **Quota Assignment**

Each Plan Participant with direct sales responsibility will be assigned a quota in writing. All quotas will be assigned and measured based on a two-year contract value as stated in the contract.

Sales personnel starting after April 1, 2000, will receive a pro-rated quota based on their start date; however, assigned quota will not be less than six months of the annual 2000 sales quota in place for their position. Sales personnel starting prior to April 1, 2000 will receive the normal annual sales quota. Sales attainment of 70% of sales quota during the first full year on sales quota is considered minimum acceptable performance. In subsequent years, attainment of 100% of quota is minimum expected level of performance. Achievement levels below 100% of quota may be deemed unsatisfactory performance and may result in those individuals being placed on a performance improvement plan and/or dismissed from their position and/or the company.

# 2   ROLES AND RESPONSIBILITIES

2.1 **Director of Sales, Payor Solutions**

The role of the Director of Sales, Payor Solutions, is to sell XCare.net Solutions to Third Party Administrators (TPAs), HMOs, PPOs, MSOs, and Employer Groups and Coalitions within the assigned territory.

2.2 **Director of Sales, Provider Solutions**

The role of the Director of Sales, Provider Solutions is to sell XCare.net Solutions to Integrated Delivery Networks (IDNs), Group Practices, Carve-outs, Clinics, and Centers of Excellence within the assigned territory.

2.3 **Director of Sales, Business Solutions**

The role of the Director of Sales, Business Solutions is to sell XCare.net Solutions to pharmacies, clinical laboratories, pharmaceutical companies, device manufacturers and distributors, and health staffing agencies and all other Healthcare related companies within the assigned territory.

2.4 **Director of Technology**

The role of the Director of Technology is to serve in a supportive role of sales as the technical expert on XCare.net architecture.

2.5 **Product Consultant**

The role of the Product Consultant is to serve in a supportive role to demonstrate XCare.net products.

2.6 **Inside Sales Representative**

The role of the Inside Sales Representative is to maximize penetration of tactical products and services to all existing XCare.net customers. The primary focus includes interfaces, upgrades, services, education additional user licenses and

member fees, non-competitive renewals, non-competitive add-on facilities and business partner solutions.  The Inside Sales Representative will sell products and services under $100,000 in two year book value that do not require an on-site sales effort (i.e. on-site demo).  Any Inside Sales software opportunity that exceeds $100,000 must receive joint written approval from the Executive Director of Sales and the Senior Vice President of Sales.

Products and Services under $25,000 list price is the sole responsibility of the Inside Sales Representative.  Sales Directors are not eligible for quota credit or commission for two-year sales under $25,000, ((the only exception is the envisioning session).

**2.7    Sales Associate**
The role of the Sales Associate is to help facilitate the closure of sales by performing tasks associated with various sales events as assigned by Sales Management.  This includes, but is not limited to, RFP responses, prospecting, and lead generation, sale call planning and execution forecasting and funnel reporting, coordination of demonstrations and seminars and other general needs in the sales cycle.

**2.8    Other Sales Related Roles**
These roles include but are not limited to those within our Sales Support groups

# 3.0    SALES DEFINITIONS

**3.1    Sales Credit**
The original signed agreement must be received by Accounting within three (3) business days after the effective date of contract.

All contingencies (Board of Director Approval, Certificate of Need, etc.) relating to contracts must be included in the contract.  No quota credit will be given or commission paid until all contingencies related to the contract have been removed.  No side letters will be honored as contractual and are prohibited.  Any side letters discovered will be grounds for immediate termination.

Commissions will be based only on two-year contract value for quota received for a sale.

Quota adjustments made after mid-year are not retroactive, but become effective on the date of the documented adjustment.

Quota credit maybe split between two or more Plan Participants if agreed to in advance and documented in writing by the Executive Director of Sales.  Commission will be calculated based on each Plan Participant's year-to-date quota attainment.  The split percentage applies to both quota credit and

commission and will not exceed 100% in any situation. No end of year reallocation of quota splits will be allowed.

### 3.2 Quota Credit

Quota credit for field sales representatives will be equal to the two-year book value of the signed XCare.net agreement. XCare.net development services are valued at 100% of Quota.

### 3.3 Service Margin

Quota credit will not be given on products or services if it is discounted more than 10%. Exceptions require approval in advance and in writing from the Senior Vice President of Sales. Projects must be scheduled to start within 60 days of the effective date of the contract.

### 3.4 Presidents Club Eligibility Criteria

Presidents Club eligibility will be a measure of cumulative performance from January 1, 2000 through December 31, 2000.

Attainment of 100% of the Club Quota, defined as 110% of sales representatives Total Quota, is specified in the individual's 2000 Sales Incentive Plan Agreement (Attachment A) and required to be eligible for Presidents Club.

Director of Technology and Product Consultant Associates must meet their President Club goals in their Sales Incentive Plan Agreement (Attachment A) to qualify for Presidents Club. Senior Management reserves the right to determine attendance.

All other non-quota carrying employees are considered guests. Attendance to Presidents Club is based on eligibility attainment as assigned in the Sales Incentive Plan Agreement (Attachment A) and/or availability. Senior Management reserves the right to determine attendance.

Plan Participants must be on this Plan for at least 6 months of the Plan year, to be eligible for Presidents Club. The Senior Vice President of Sales must approve all exceptions.

## 4. SALES PROCESSES

### 4.1    Rules and Procedures

Commission and bonus payments will only be made to Plan Participants that have an original, fully executed Sales Incentive Plan Agreement (Attachment A) of the 2000 Sales Incentive Plan Agreement on file with XCare.net accounting department.
Quota credit and commission will not be paid until the Agreement is completed, or the transition meeting has taken place, or the services are slotted within 60 days of contract execution. The sales representative should contact Professional Services (and maintain a contact record via e-mail) for slotting within 30 days of contract execution. Professional Services will have 60 days from contract execution to provide a slot. If Professional Services have not been slotted within 60 days and the sales representative has met all obligations in notifying professional services, the commission shall be paid 60 days after contract execution.

All commission payments above $50,000 must have the written approval of the CFO.

### 4.15    Payment of Commissions

XCare shall calculate commissions within 15 days following the close of each calendar month and shall pay commissions pursuant to the provisions of this plan by the end of month following the quarter's end.

Commission and bonus payments are defined in attachment A and will be paid 100% up to 100% to quota or $80,000, whichever occurs first. The remaining commission are bonus balance due and will be paid on a prorated quarterly basis over the term of the contract subject to cancelations as defined in section 4.4.

Each Executive Director of Sales must review/audit and sign any commission requests before they are sent to the commission processing team. The quarterly deadline for submission to the commission processing team is the fifth working day of the last month of the quarter. All commission requests received later than that time specified above will be processed in the next quarterly commission run.

### 4.2    Documentation
Signed contracts must be received, in full, via fax, FedEx, etc., within 3 business days of effective date.

All contingencies relating to contracts (Board Approval, Certificate of Need, etc.) must be included in the contract. No quota credit will be given or commission paid until all contingencies related to the contract have been removed. No side

letters will be honored as contractual and are prohibited. Any side letters discovered will be grounds for immediate dismissal.

Orders for XCare.net products and services must be submitted to Accounting on a signed standard XCare.net agreement. Commission will not be paid until all documentation is complete and in Accounting.

Commission requests must be submitted to the Executive Director of Sales by the third working day of the month. The Executive Director of Sales will review/audit commission requests and submit them in bulk to the commission processing team no later than the fifth working day of the month.

### 4.3    Pricing Discounts

All product and service discounts require the approval of the Executive Director of Sales. Discounts may not exceed 10%. Exceptions require the approval of the Senior Vice President of Sales.

### 4.4    Cancellations

XCare.net will stop payment of commission against the person that received the initial commission from an agreement that terminates prematurely or results in future concessions, credit memos or other contract adjustments, not agreed to in advance in writing by the Senior Vice President of Sales. Any recoverable commission will be netted against future commission and bonuses.

Money due to XCare.net from a Plan Participant by virtue of an expense report, advance, draw, charge back of commissions or other reasons, will be deducted from commission or bonus.

### 4.5    Commission Issues

Any payment questions / issues/ disputes for the current plan year should be documented in an e-mail, approved by the respective Executive Director of Sales and sent to Commission Accounting. If necessary, Sales Management will be contacted for resolution.

Certain employees may be eligible for a monthly draw against their earned commissions. Commissions or bonuses paid will be netted against an employee's draw.

Any deferred commissions or bonuses not paid as of the employee's date of termination, are forfeited, regardless of the years commissions were earned.

Attachment A

Sales Incentive Plan Agreement

Assigned Quota: $2.5 M

Assigned Territory: Rocky Mountain Region , all books of business

The following is the Commission Rate structure:

| Percentage to Quota | Commission Rate |
|---|---|
| 0-50% | 1.6% |
| >50-100% | 4.0% |
| >100-150% | 6.0% |
| >150% | 7.0% |
| | |

Acknowledgement:

By my signature below, I acknowledge that I have read this document, understand its contents, and agree to be bound by its terms and conditions.

Director of Sales                                    XCare.net

By: _Anne S McClell_                      By:_____

Print Name: _Anne S McCollla_         Print Name:_____

Date: _____                   Date:_____

Address: _181 Sequoia Ave_             Address:_____
_Walnut Peek, Co_                        _____
_94595_