John A. McGuinn (State Bar No. 36047)
Noah D. Lebowitz (State Bar No. 194982)
McGUINN, HILLSMAN & PALEFSKY
535 Pacific Avenue
San Francisco, CA 94133
Tel.:   (415) 421-9292
Fax:   (415) 403-0202

Attorneys for Plaintiff
ANNE McCOLLUM

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### (OAKLAND DIVISION)

| | |
|---|---|
| Anne McCollum,<br><br>Plaintiff,<br><br><br>v.<br><br><br>XCare.net, Inc. and Does 1-5, inclusive,<br><br>Defendant | Case No.  C 01-1738 CW<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>DATE:   April 19, 2002<br>TIME:    10:00 a.m.<br>PLACE:   Crtrm.  2<br>Hon.  Claudia Wilken |

1

**TABLE OF CONTENTS**

2   I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3   II.     RESPONSE TO XCARE'S PURPORTEDLY UNDISPUTED FACTS . . . . . . . . 2

4   III.    McCOLLUM'S ADDITIONAL MATERIAL FACTS IN DISPUTE . . . . . . . . . . . . 3

5           A.      McCollum's Employment with XCare . . . . . . . . . . . . . . . . . . . . . . . . . 3

6                   1.      The Technology Partnership Contract . . . . . . . . . . . . . . . . . . . . 4

7                   2.      McCollum's Commission on the Technology
                            Partnership Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
8
9                   3.      XCare's Rush to Terminate McCollum Before the
                            Technology Partnership Contract Signing . . . . . . . . . . . . . . . . 7

10                  4.      XCare's Ever-Shifting Explanation for Terminating
                            McCollum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
11
12                  5.      XCare's Attempt to Classify the Termination as a
                            Resignation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

13          B.      The Signing of the Technology Partnership Contract . . . . . . . . . . . . . . 9

14          C.      XCare's Partial Payment of Commission on the FHS Deals . . . . . . . . 10

15  IV.     XCARE HAS FAILED TO CARRY ITS BURDEN ON SUMMARY
            JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
16
17  V.      ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18          A.      XCare Deliberately Misreads McCollum's Complaint in a Transparent
                    Attempt to Limit the Scope of Her Claims . . . . . . . . . . . . . . . . . . . . . . 11

19          B.      The 2000 Comp Plan's Ambiguous Language and Unconscionable
                    Terms, and XCare's Past Performance, Raise Triable Issues as to
20                  McCollum's Breach of Contract Claim . . . . . . . . . . . . . . . . . . . . . . . . . 12

21                  1.      The Comp Plan's Ambiguous Language . . . . . . . . . . . . . . . . . 12

22                  2.      The Forfeiture Clause is Unconscionable . . . . . . . . . . . . . . . . 13

23                  3.      XCare's Past Performance Raises Triable Issues . . . . . . . . . . 15

24          C.      The Timing of McCollum's Termination and XCare's Actions Leading
                    to that Termination Raise Triable Issues as to McCollum's Claim that
25                  XCare Terminated Her so as to Retain the $570,130 Commission
                    it was About to Owe Her . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
26
27                  1.      The Covenant Applies to XCare's Exercise of Discretion . . . . . 16

28                  2.      XCare Breached the Covenant . . . . . . . . . . . . . . . . . . . . . . . . 18

D.    XCare Fails to Substantively Address McCollum's Labor Code Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

E.    XCare's Refusal to Pay McCollum Her Commission on the Technology Partnership Contract Constitutes an Unfair Business Practice That Should Result in the Disgorgement of the Commission Proceeds Retained by XCare . . . . . . . . . . . . . . . . . . . . . . .  21

1.    Because XCare's Actions Violate the California Labor Code, They Also Violate the UCL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

2.    XCare's Forfeiture Practice is also "Unfair" and Therefore Violates the UCL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

F.    McCollum's Public Policy Claim Falls Squarely Within California Law  .  24

G.    McCollum Has Raised a Triable Issue as to Her Declaratory Relief Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

VI.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

**TABLE OF AUTHORITIES**

**Cases**

*A&M Produce Co. v. FMC Corp.*
   (1982) 135 Cal.App.3d 473 (186 Cal.Rptr. 114, 38 A.L.R.4th 1) . . . . . . . . . . .  13

*American Software, Inc. v. Ali*
   46 Cal.App.4th 1386 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 15

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*Barnhill v. Robert Saunders & Co.*
   125 Cal.App.3d 1 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Carboni v. Arrospide*
   (1991) 2 CalApp.4th 76 (2 Cal.Rptr.2d 845) . . . . . . . . . . . . . . . . . . . . . . .  13

*Celotex Corp. v. Catrett*
   477 U.S. 317 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 20

*Cel-Tech Communic., Inc. v. Los Angeles Cellular Tel. Co.*
   20 Cal.4th 163(1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21, 22

*Commercial Union Assurance Cos. v. Safeway Stores, Inc.*
   26 Cal.3d 912 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*Cortez v. Purolater Airfiltration Prod. Co.*
   23 Cal.4th 163, 168 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22, 23

*Davis v. Morris*
   37 Cal.App.2d 269 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Ellis v. McKinnon Broadcasting Co.*
   18 Cal.App.4th 1976 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

*First Nat'l Bank of Vista v. Hellen*
   392 F.2d 58 (9th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Foley v. Interactive Data Corp.*
   47 Cal.3d 654 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*Gantt v. Sentry Insur.*
   1 Cal.4th 1083 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

*Gould v. Maryland Sound Indus., Inc.*
   31 Cal.App.4th 1137 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

*Guz v. Bechtel Nat'l. Inc.*
   24 Cal.4th 317 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*Halvorsen v. Aramark Uniform Svcs.*
   65 Cal.App.4th 1383 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*Hudgins v. Neiman Marcus Group, Inc.*
    34 Cal.App.4th 1109  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

*Kelecheva v. Multivision Cable T.V. Corp.*
    18 Cal.App.4th 521 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Kuhn v. Department of Gen'l Svcs.*
    22 Cal.App.4th 1627 (1994)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Locke v. Warner Bros., Inc.*
    57 Cal.App.4th 354  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 20

*Nager v. Allstate Ins. Co.*
    83 Cal.App.4th 284 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Perdue v. Crocker Nat'l Bank*
    38 Cal.3d 915 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Pettus v. Cole*
    49 Cal.App.4th 402  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Reeves v. Sanderson Plumbing Products, Inc.*
    530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12

*Soules v. Cadam, Inc.*
    2 Cal.App.4th 390 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Southern Cal. Edison, Co. v. Superior Court*
    37 Cal.App.4th 839 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Starzynski v. Capital Public Radio, Inc.*
    88 Cal.App.4th 33 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Statutes**

Cal. Bus. & Prof. Code § 17200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Cal. Bus. & Prof. Code § 17203 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

Cal. Civ. Code § 1641 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Cal. Civ. Code § 1670.5(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Cal. Code Civ. Proc. § 1060 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Cal. Labor Code § 200(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Other Authorities**

*California Division of Labor Standards Enforcement Policies and*
    *Interpretations Manual*, § 17.6 (Oct. 1998)  . . . . . . . . . . . . . . . . . . . . . . . . 21

11 *Moore's Fed. Prac.*, § 56.13[1] (Matthew Bender 3rd ed.)  . . . . . . . . . . . . . 11, 20

## I.      INTRODUCTION

Despite defendant XCare.net, Inc.'s ("XCare") deliberate obfuscation of plaintiff Anne McCollum's ("McCollum") claims, this case is a simple one: In October 2000, XCare fired McCollum so that it could retain the benefit of her anticipated $570,130 commission.  XCare's willful actions breached McCollum's compensation contract as well as the covenant of good faith and fair dealing attendant to that contract.  In so doing, XCare violated the California Labor Code, California Business and Professions Code, and the public policy of the State of California.

XCare hired McCollum in June 2000 as its Director of eHealth Solutions for the Western Region, a high level sales manager position.  When the company recruited McCollum, it lured her with a promise of the company's commission plan, a plan that allowed her to earn unlimited commissions.  This promise of "the sky's the limit" was a prominent selling point for McCollum to move to XCare.

McCollum proved to be an extremely effective sales person and was responsible for coordinating the largest contract that the company had ever seen: the Foundation Health Services - XCare.net Technology Partnership Contract ("Technology Partnership Contract").  As the Technology Partnership Contract negotiations drew to a close in late September 2000, the company realized that it would have to make good on its commission promise – as set forth in the company's 2000 Sales Incentive Compensation Plan ("Comp Plan") –  to the tune of $570,130.  XCare balked.  The company saw a significant amount of bookable income going out the door to an employee and desperately sought for a way to prevent that from happening.   When Foundation Health Services ("FHS") caused the contract signing to be delayed, XCare had its chance.  XCare moved swiftly to terminate McCollum on the eve of the anticipated signing date.

After attempting to informally resolve this conflict for several months, McCollum determined that she had no other choice but to file the present action to recover her

commission and all other damages that she had suffered because of XCare's bad faith scheme to cheat her out of the compensation she was promised, and earned.

**II.   RESPONSE TO XCARE'S PURPORTEDLY UNDISPUTED FACTS**

1-5; 7-12; 15-16.     Undisputed as set forth.  Though, as explained in full below, McCollum does dispute the completeness and further characterization of those facts as set forth in XCare's motion.

6.     Disputed in Part.  Blodgett's statement regarding the alleged status of contract negotiations between FHS and XCare (Blodgett Decl. ¶ 5) is inadmissible and insufficient to establish this "fact."  The truth of the "fact" is also disputed.  Blodgett, a "Human Resources Specialist", in his own declaration states that his personal knowledge extends only to "issues related to personnel and the documentation maintained by XCare relating to personnel, including salaries and commissions." Blodgett Decl. ¶¶1-2.  His declaration is devoid of any reference to how he attained personal knowledge regarding the status of contract negotiations.  Further, the record shows that – while the two companies did have a prior business relationship – the idea for the Technology Partnership Contract was not even voiced until after McCollum came on board.  Cangarlu Depo 38:1-40:14.[1]

13.     Disputed in Part.  McCollum did not resign.  She did not sign the unsolicited resignation and general release that was sent to her because it said she resigned and because it called for her to release XCare from its obligation to pay her commissions on the Technology Partnership Contract.  McCollum Depo 227:2-20[2]; McCollum Decl. ¶ 12 & Exh. F.

14.     Disputed.  XCare has "taken the position that she resigned effective

---

[1] Excerpts of the deposition of Afshin Cangarlu are attached as Exhibit C to the Lebowitz Declaration, submitted herewith.

[2]Excerpts of the deposition of Anne McCollum are attached as Exhibit A to the Lebowitz Declaration, submitted herewith.

1    10/11/00." Lebowitz Decl. ¶ 8 & Exh. G. It is McCollum's allegation that she was

2    notified of her termination on October 10, but that she and XCare would work out a

3    mutually agreeable, 30-day transition plan. McCollum Depo 110:10-111:24, 227:2-

4    228:8.

5    **III.   McCOLLUM'S ADDITIONAL MATERIAL FACTS IN DISPUTE**

6        McCollum, has a long stellar career in California's health care sales and

7    marketing industry. *See* McCollum Decl. ¶ 2, Exh A. Before being recruited by XCare,

8    she steadily worked her way up the ladder with various top California healthcare

9    providers, including Kaiser Permanente and FHS. *Id.* While McCollum was staffing a

10   booth at a Las Vegas trade show in the Spring of 2000, she was approached by Mark

11   Rangell, a senior executive at XCare who then recruited McCollum to work at XCare.

12   McCollum Depo 71:13-72:3, 78:23-80:16.

13       As it was described to her, XCare provided the health care industry with leading

14   edge technologies to integrate back end systems (*e.g.*, claims, eligibility, enrollment) in

15   order to deploy these applications over the internet.    McCollum Decl. ¶ 3. Accordingly,

16   McCollum saw XCare as representing a logical next step in her career, injecting her

17   firmly into the "new economy." *Id.*

18       **A.    McCollum's Employment with XCare**

19       McCollum was employed by XCare from July 5, to October 11, 2000. *Def's Mem*

20   *P&A* at 8:4. McCollum was paid an annual salary of $85,000, plus benefits. Blodgett

21   Decl., Exh. A. She also was entitled to a commission on all contracts signed on her

22   accounts. *Id.* The rate of that commission was governed by the Comp Plan. *Id.* at Exh.

23   B.

24       McCollum worked as a remote employee, out of her home office in Northern

25   California.[3]    As it was explained to her, McCollum was responsible for prospecting for

26

27       [3]XCare's official headquarters is located in a suburb of Denver, Colorado, though the
28   company also maintains an office in Woodland Hills, California.

business to XCare and coordinating contract negotiations.  McCollum Depo 124:10-125:18.  While she did not primarily engage in substantive negotiations over contract terms, she was responsible for ensuring that the right people were talking to each other – techies to techies, CEO's to CEO's, etc. McCollum Decl. ¶ 5; McCollum Depo 171:2-14; Cangarlu Depo 22:3-23:2, 84:14-22, 93:2-10.  In so doing she coordinated the contract negotiations, or, in XCare-speak, she "drove" the contract.  Pianko Depo 177:25-178:9.[4]  Ultimately, McCollum was responsible for making sure the contracts, both interim and long-term, got signed.  McCollum Depo 172:8-22.

McCollum reported directly to Laurie Heilmann, the XCare Director of Sales. McCollum also had contact with Heilmann's direct supervisor, Tom Pianko, the Executive Vice President of Sales and Marketing.  McCollum Decl. ¶ 4.

McCollum was assigned to the company's "Western Region" which encompassed the western United States.  McCollum Depo 124:10-18.  At the time she started with XCare, the company had only one existing account in that region – FHS.  It was her responsibility to continue the work with FHS as well as bring in new accounts. McCollum Depo 125:19-126:6.

## 1.    The Technology Partnership Contract

One of XCare's primary reasons for hiring McCollum was her prior professional relationship with FHS.  McCollum Depo 99:21-100:21.  When McCollum began working at XCare, the company was just about to consummate a small services contract with one of FHS' New Ventures Group divisions known as LAPS.  McCollum Depo 140:16-142:4; Cangarlu Depo 15:18-18:9, 36:19-23.

As soon as McCollum came onto the account, however, FHS' New Ventures Group President Gary Velasquez first articulated his vision for the two companies to engage in a long-term comprehensive business relationship.  Cangarlu Depo 38:1-

---

[4]Excerpts of the deposition of Tom Pianko are attached as Exhibit B to the Lebowitz Declaration, submitted herewith.

1   40:14.  After this so-called envisioning session, McCollum immediately crafted what

2   would become the Technology Partnership Contract.  Cangarlu Depo 40:20-42:7;

3   McCollum Decl. ¶ 6.  Following Velasquez' vision, that contract would extend over a two

4   year period and be worth in the neighborhood of $10 million in revenue to XCare.

5   McCollum Decl. ¶ 6.

6          The Technology Partnership Contract was a complex undertaking.  As XCare's

7   West Coast General Manager, Afshin Cangarlu testified, "It wasn't as easy as we

8   thought it was going to be."  Cangarlu Depo 34:21-22; *see also id.* at 14:3-15:17.

9   Attempting to unite the myriad divisions of FHS' New Ventures Group under one

10  technology umbrella contract was a herculean task. It was not simply a negotiation

11  between two companies.  The corporate structure of FHS required that XCare negotiate

12  deals with each of the New Ventures Group divisions and their respective leaders, not

13  just Velasquez.  Cangarlu Depo 32:16-33:6; McCollum Depo 148:23-150:16.  Indeed,

14  Velasquez, himself, proved to be an unpredictable, somewhat temperamental business

15  partner.  Cangarlu Depo 33:7-34:22; *see also* McCollum Decl. ¶ 10 & Exh. D.  In

16  addition to this multi-headed structure, FHS brought its own internal political in-fighting

17  into the equation.  Cangarlu Depo 32:16-33:6.  From the XCare side, this contract was

18  the first major undertaking for the company by both McCollum and Cangarlu.[5]

19  Cangarlu Depo 34:23-35:5. All of these factors, mixed together with in-house counsel

20  and outside auditors – each making revisions and demands upon the contract language

21  – came together to form a unwieldy process full of redundancy and role confusion.  *Id.*

22  42:8-19; McCollum Depo 114:12-20.

23         For instance, McCollum spent the first weeks of her employment selling and

24  finalizing Statement of Works ("SOW") from each of the New Ventures Group divisions.

25  In essence, these SOW's were short-term contracts that allowed the partnership to

26

27         [5]Cangarlu was the primary "technical" contact at XCare for this negotiation, while
28  McCollum was the primary "big picture" sales contact.  McCollum Decl. ¶ 5.

1  begin developing while the final contract negotiations were ongoing.  Cangarlu Depo

2  35:6-36:10.  These SOW's were drafted – as was customary – by Laura Deer of

3  XCare's Business Development and Sales department.  McCollum Decl. ¶ 7.

4  Unfortunately, after McCollum successfully got all of the necessary SOW's signed, the

5  XCare auditors said they were insufficiently drafted to book the revenue for the third

6  quarter.  McCollum Depo 153:10-154:5.  So, McCollum had to wait for newly drafted

7  SOW's, and then get the New Ventures Group division heads to sign them again.  *Id.*

8  200:5-201:1; McCollum Decl. ¶ 7 & Exh. B.  At the same time, McCollum was

9  responsible for making sure the overall technology partnership contract was on track.

10 McCollum Decl. ¶ 7; *see also* Cangarlu Depo 43:14-44:2

11        In the face of these constantly evolving obstacles, McCollum worked tirelessly on

12 the Technology Partnership Contract.  With all the various players involved in the deal, it

13 took up almost the entirety of each working day to make sure that the it was on track.

14 McCollum Decl. ¶ 8.  She often worked 12 hour days and weekends to meet the

15 demands of this contract.  *Id.*  At the same time, XCare was telling her that the company

16 desperately needed the contract signed and the revenue booked.  McCollum Depo

17 199:15-200:4.

18        McCollum did an admirable job.  Indeed, throughout the project, McCollum

19 received praise and encouragement from Heilmann and Pianko.  McCollum Decl. ¶ 9 &

20 Exh C.  Not once did she receive any negative feedback as to her performance.

21 McCollum Depo 158:4-9; Pianko Depo 171:21-23.

22        Near the end of August, XCare realized that there was a real risk that the

23 Technology Partnership Contract would not be signed by the end of the fiscal quarter,

24 so the company prepared an interim contract that would allow XCare to realize revenue

25 while continuing the negotiation.  Pianko Depo 167:1-169:17; Cangarlu Depo 46:5-21;

26 Lebowitz Decl. ¶ 10 & Exh. I.

27        By the end of September, it looked like the contract was finally ready to be

28

signed.  In fact, September 22 was set to be the "signing day."  McCollum Depo 206:15-210:22; McCollum Decl. ¶ 10 & Exh. D.  However, at the last minute Velasquez demanded several substantive changes to the deal.  *Id.*; *see also* Cangarlu Depo 59:17-20.  So, the signing date had to be postponed until these final glitches could be worked out.  McCollum Depo 207:8-20; Pianko Depo 173:16-174:3; Cangarlu Depo 45:12-47:22.

### 2.    McCollum's Commission on the Technology Partnership Contract.

McCollum's compensation at XCare was governed, in part, by the Comp Plan. *Def's Mem P&A* at 6:21-25.   When XCare recruited McCollum, it promised her that there was no limit to her commissions.  McCollum Decl ¶ 3; *see also* Blodgett Decl. Exh. B (no provision that placed caps or limits on commissions).  That plan, a standard form, was written exclusively by Pianko and XCare senior management.  Pianko Depo. 140:23-141:23.  McCollum was not given any opportunity to negotiate the terms of the plan.  *Id.*; *see also* McCollum Decl. ¶ 3.

As the Technology Partnership Contract stood at the end of September, it was a two-year deal that would have resulted in a commission payout of $570,130.  Harrison Decl. ¶ 2.

### 3.    XCare's Rush to Terminate McCollum Before the Technology Partnership Contract Signing

Realizing that it was going to have to pay McCollum commissions of $558,782 on the Technology Partnership Contract, XCare moved to make sure it retained the benefit of that income.

On Friday, October 6, Pianko announced to senior management, that McCollum would be terminated for "cost cutting" reasons.  Lebowitz Decl. ¶ 6 & Exh. E.   Pianko insisted that such termination take place no later than Wednesday, October 11.  *Id.*   In XCare's mind it was imperative that McCollum be terminated by October 11 because Pianko was "shooting for a Thursday [October 12] signature" on the Technology

1  Partnership Contract. *Id.* at Exh. K.

2        **4.**    **XCare's Ever-Shifting Explanation for Terminating McCollum**

3       As state above, on Friday October 6, XCare labeled McCollum's termination as

4  one for "cost cutting" reasons.  Lebowitz Decl. ¶ 6 & Exh. E.  In the first of many

5  different stories, on Monday, October 9, Pianko shifted his position and declared

6  McCollum's termination to be a result of her performance.  *Id.* at ¶ 7 & Exh. F.  This shift

7  in position was prompted by XCare's CEO, Lorine Sweeney.  *Id.*

8       On Tuesday, October 10, Heilmann informed McCollum of her termination.

9  McCollum Decl. ¶ 11 & Exh. E.  Heilmann claimed that XCare had received complaints

10  from employees of both XCare and FHS about McCollum's performance, though she

11  did not give any specifics as to those alleged complaints.  *Id.*  As it turns out, that

12  statement was a fabrication, one that XCare has repeated throughout this litigation.

13  *Compare* Lebowitz Decl. ¶ 11, Exh. J (XCare response to Interrogatory No. 10,

14  asserting that the company received complaints about McCollum from Velasquez), *with*

15  Pianko Depo 23:4-9, 182:7-11 (insisting that Velasquez never voiced any complaints

16  about McCollum).  Nobody from FHS ever told XCare that they thought McCollum was a

17  poor performer or that she should be removed from the FHS account.  *Compare* Pianko

18  Depo 27:23-29:20 (testifying that Dutt insisted that McCollum be removed from the FHS

19  account), *with* Dutt Depo 16:19-19:14 (denying ever making such a request, or having

20  the power to make such a request). [6]

21       The next day McCollum learned from Pianko that he had never heard any

22  complaints about her performance.   McCollum Depo 117:7-118:5.  He attributed the

23  problem to a "personality conflict" between McCollum and Heilmann. *Id.*

24       McCollum had never received any sort of performance review or performance

25  counseling while at XCare.  McCollum Depo 158:4-9; Pianko Depo 171:21-23.  Her

26

27       [6]Excerpts of the deposition of Amitaubh Dutt are attached as Exhibit B to the

28  Lebowitz Declaration, submitted herewith.

termination came as a complete shock.  McCollum Depo 130:13-17 ("[Y]ou could have knocked me over with a feather on October 10.  That's how shocked I was.  I had no premonition or inclination."), 223:24-223:13, *see also* McCollum Decl. ¶ 11 & Exh. D (telling Heilmann and Pianko, she hopes to "understand what has actually transpired here.").  As XCare's Director of Human Resources stated, "performance issues should be documented by the manager and the employee should be made aware of those issues all along, not just upon termination."  Lebowitz Decl. ¶ 8 & Exh. G.

### 5.    XCare's Attempt to Classify the Termination as a Resignation

XCare clearly intended this action to be a termination.  *See* Lebowitz Decl. Exh. E (Pianko stating:  "The following individuals are going to be *let go . . .*") (emphasis added), Exh. F (Sweeney responding:  "We need to discuss whether these are lay-offs of performance related *terminations*.") (emphasis added).  Even though Pianko and XCare's senior management determined that they would terminate McCollum's employment, they subsequently declared themselves to be "*taking the position* that she resigned effective 10/11/00."  *Id.* at ¶ 8 & Exh. G (emphasis added).

Heilmann gave McCollum the "choice" of going on a performance plan – whereby she would be off the FHS account – or accepting termination and a 30-day transition plan in which McCollum would be phased out her work for the company, but still be eligible for commissions on contracts signed in that period.  McCollum Depo 110:10-111:24, 227:2-228:8.  McCollum opted for the transition plan, knowing that the hundreds of hours that she had put into the Technology Partnership Contract were about to be rewarded – as per her terms and conditions of employment – with the impending signing of the contract.  *Id.*

### B.    The Signing of the Technology Partnership Contract

The October 12 signing date never materialized.  However, on October 20, 2000 (*i.e.,* only one week after officially terminating McCollum), XCare and FHS executed the

1  final contract.  Lebowitz Decl. ¶ 9 & Exh. H. The final contract was only for one year,

2  though FHS retained a unilateral option to extend the contract by one additional year.

3  *Id.* at § 10.1, p. 6.

4        Upon hearing this news, McCollum wrote to XCare and requested 30-days salary

5  and commission for her work on the Technology Partnership Contract.   McCollum Decl.

6  ¶ 12 & Exh. F.  XCare never even bothered to respond to McCollum's request.  *Id.*

7        **C.      XCare's Partial Payment of Commission on the FHS Deals**

8        In the second week of October, XCare paid McCollum for the commissions she

9  had earned on the interim contract, which was signed on September 29.  McCollum

10 Decl. ¶ 12; Pianko Depo 178:10-179:1; *see also* Lebowitz Decl. ¶ 10 & Exh. I.  Those

11 commissions were calculated in accordance with the payment schedule attached to the

12 Comp Plan.  Pianko Depo 180:13-181:2; *see also* Blodgett Decl. Exh. B.

13 **IV.    XCARE HAS FAILED TO CARRY ITS BURDEN ON SUMMARY JUDGMENT**

14       The Supreme Court has articulated an exacting standard for granting defense-

15 initiated summary judgment.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530

16 U.S. 133, 149-54 (2000).  In *Reeves*, the unanimous Court summarized the combined

17 teaching of the 1986 summary judgment trilogy as follows:

18       1.    The court must review the record, "taken as a whole";

19       2.    The court must draw all inferences in favor of the nonmoving party;

20       3.    The court may not make credibility determinations;

21       4.    The court may not weigh evidence;

22       5.    The court must disregard all evidence favorable to the moving party that

23             the jury is not required to believe;

24       6.    The court should give credence to the evidence favoring the nonmovant;

25       7.    The court should give credence to the evidence that supports the moving

26             party "that is uncontradicted and unimpeached, at least to the extent that

27             the evidence comes from disinterested witnesses."

28

1   *Id.* at 150-51 (citations omitted).  In the end, the court must ask whether a reasonable

2   jury *might* find in favor of the plaintiff.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

3   250 (1986)  If so, then summary judgment must be denied.

4         Moreover, as the moving party, XCare "bears the initial responsibility of informing

5   the district court of the basis of that motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317,

6   323.  This burden is not met by a mere assertion. 11 *Moore's Fed. Prac.*, § 56.13[1]

7   (Matthew Bender 3rd ed.)

8   **V.   ARGUMENT**

9       **A.   XCare Deliberately Misreads McCollum's Complaint in a Transparent
    Attempt to Limit the Scope of Her Claims**

10

11         Throughout its motion, XCare deliberately misconstrues McCollum's complaint.

12   Specifically, XCare attempts to limit her complaint to the following contention: If XCare

13   had honored its promise of a 30-day mutually agreeable transition plan, McCollum

14   would have earned the commission on the Technology Partnership Contract.  *See*

15   *Def.'s Mem.* at 11:20-22, 12:11-15, 14:7-8, 14:19-20, 16:26-17:1.  However, McCollum's

16   complaint reveals that her contentions – while encompassing the above allegations –

17   are much more far-reaching.  *See Complaint* at ¶¶ 36, 42, 54, 59, 60, 63, 64.

18   McCollum's complaint plainly alleges that XCare wrongfully, and in bad faith, removed

19   her from the FHS account and terminated her employment with the company.  It is

20   McCollum's contention that, but for this wrongful termination, she would have been

21   working at XCare for an indeterminate period of time, not just for the next 30-days.

22   Thus, XCare's continued recitation of what it perceives to be "McCollum's version of

23   events" is entirely misleading and ignores a major component of her complaint.

24         When XCare's intentional misconstruction of events is removed, it's motion is

25   unveiled as a misguided attempt to shoehorn McCollum's complaint into a space that it

26   does not reside.

27

28

**B.    The 2000 Comp Plan's Ambiguous Language and Unconscionable Terms, and XCare's Past Performance, Raise Triable Issues as to McCollum's Breach of Contract Claim**

The Comp Plan is a classic adhesion contract.  It is a standard form drafted solely by Pianko and XCare management. Pianko Depo 140:23-141:23.  McCollum had no opportunity to negotiate over any of the terms of the contract.  *Id.*; *see also* McCollum Decl. ¶ 3.  Accordingly, the doctrine of *contra proferentum* dictates that all ambiguities in that contract must be construed against XCare, and in favor of McCollum. This doctrine holds special importance on summary judgment, where all inferences are to be construed in McCollum's favor in her effort to identify triable issues as to her breach of contract claim.  *Reeves,* 530 U.S. at 150-51.

### 1.    The Comp Plan's Ambiguous Language

Despite XCare's self-serving assertion that the Comp Plan is "unambiguous", key clauses of that contract remain vague and open to interpretation.  To begin, the most important clause of the contract for this litigation is poorly constructed and raises questions as to XCare's application of that clause to McCollum.  Specifically, XCare relies on Section 1.5 of the Comp Plan as the basis for withholding her commission on the Technology Partnership Contract.  That section provides:

> If *an employee terminates employment* at XCare.net at any time prior to actual payment of a commission, unearned or otherwise deferred commission payments that have not been disbursed to Plan provisions will be forfeited.

Blodgett Decl. Exh. B (emphasis added).  On its face, this clause only applies to situations where "an employee terminates employment" – *i.e.,* where the employee is the actor and takes affirmative steps to resign.  There is no language in the Comp Plan that addresses the situation where the *employer* terminates the employee's employment.  Accordingly, the Comp Plan does not address the present situation.  Thus, there is no provision permitting XCare to withhold the commissions from the Technology Partnership Contract.  Absent such a provision, the Court must construe the

1  contract to ensure equity and guard against unjust enrichment.  Those considerations

2  dictate that, at minimum, McCollum be compensated for the time and effort she

3  bestowed upon XCare to its financial benefit.  Such considerations further demonstrate

4  that the record raises a triable issue as to McCollum's breach of contract claim.

5  ### 2.  The Forfeiture Clause is Unconscionable

6  One area where the Comp Plan is unambiguous is its use of the term "forfeit" in

7  reference to earned commissions.  *See* Blodgett Decl. Exh. B at § 1.5, 4.5; *see also*

8  *Def.'s Mem P&A* at 9:17, 10:10.   As used here, this term is unconscionable.

9  Under California law, a contract term is unenforceable if it is found to be

10  unconscionable.  Cal. Civil Code § 1670.5(a). As one California Court of Appeal

11  summarized and explained:

12  
13  
14  
15  
16  
17  
18  
19  
> "'[U]conscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' [Citation]" (*A&M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 486 [186 Cal.Rptr. 114, 38 A.L.R.4th 1].)   In *A & M Produce*, this court recognized that unconscionability has both a "procedural" and a "substantive" aspect. (*Ibid.*) "The procedural element focuses on two factors: 'oppression' and 'surprise.' [Citations.] 'Oppression' arises from an inequity of bargaining power which results in no real negotiation and an 'absence of meaningful choice.' [Citations.] 'Surprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms.' [Citations.]" (*Ibid.*)

20  
21  
22  
23  
24  
25  
26  
> "Substantive" unconscionability, on the other hand, "refers to an overly harsh allocation of risks or costs which is not justified by the circumstances under which the contract was made. [Citation.]" (*Carboni v. Arrospide*, (1991) 2 Cal.App.4th 76, 83 [2 Cal.Rptr.2d 845].)  "[B]oth procedural and substantive unconscionability must be present before a contract or clause will be held unenforceable.  However, there is a sliding scale relationship between the two concepts: the greater the degree of substantive unconscionability, the less the degree of procedural unconscionability that is required to annul the contract or clause. [Citations.] (*Ibid.*)

27  *Ellis v. McKinnon Broadcasting Co.*, 18 Cal.App.4th 1796, 1804-05 (1993).

28

1    The facts of this case are strikingly similar to the *Ellis* case.  As in *Ellis*, McCollum

2  did not take time to read the Comp Plan when it was sent to her, she was told that it

3  was a standard plan.  18 Cal.App.4th at 1804; McCollum Decl. ¶ 3.  Also, McCollum had

4  no opportunity to negotiate any of the terms of the contract.  18 Cal.App.4th at 1804;

5  McCollum Decl. ¶ 3.   These facts also rise to the level of "oppression" based on

6  unequal bargaining power that the *Ellis* court found sufficient to meet the procedural

7  unconscionability prong.  18 Cal.App.4th at 1805.  Further, the *Ellis* court found

8  substantive unconscionability in the fact that the forfeiture was the result of the

9  company's actions, not upon any failure of the employee to perform his job.  18

10  Cal.App.4th at 1806-07.  The *Ellis* court also found compelling the fact that the company

11  was the sole beneficiary of the forfeiture provision, allowing it to retain nearly $20,000.

12  *Id.* at 1807.  Obviously, this case is far more compelling considering the hundreds of

13  thousands of dollars at stake.

14    In its reply, XCare may attempt to rely on the case of *American Software, Inc. v.*

15  *Ali*, 46 Cal.App.4th 1386 (1996) to argue that the forfeiture provisions are not

16  unconscionable.  However, that case is easily distinguishable on key facts.  The *Ali*

17  court found that there was no procedural unconscionability because the plaintiff had an

18  attorney review the commission contract before she signed it, and she successfully

19  negotiated out substantial terms of the original contract.  *Id.* at 1389, 1391-92.  No such

20  facts exist here.  Indeed, this case presents the exact opposite situation.  McCollum had

21  no opportunity to negotiate any terms of the contract.  Pianko Depo 140:23-141:23;

22  McCollum Decl. ¶ 3.  Rather, it was a take-it-or-leave-it situation that is a classic

23  indication of procedural unconscionability.  *See id* at 1392.

24    Also, the *Ali* court's finding of no substantive unconscionability was based on

25  several key factors that are opposite to the facts of this case.  For example, the *Ali* sales

26  contracts were ongoing, service contracts that required installment payments before

27  commissions were paid out to the salesperson.  *Id.* at 1393.  Here, all commissions are

28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1   earned when the contract is signed, there is no servicing provision.  Also, the *Ali*

2   commission contract contemplated equivalent risks to the parties that do not exist here.

3   In that case, the company paid the plaintiff a nonrefundable draw that was counted

4   against her commissions.  *Id.*  If, at the end of the employment relationship, the plaintiff

5   had not earned sufficient commissions to offset her draw, then the employer would not

6   have any right to a refund.  *Id.*   In other words, there was *an equal risk of forfeiture*.

7   The Comp Plan has no such provision; McCollum forfeits everything while XCare

8   forfeits nothing.  XCare gains the entirety of the commission earned by McCollum.

9          Considering all of the above, this Court should follow the reasoning of *Ellis* to

10  hold that McCollum has raised a triable issue as to unconscionability of the forfeiture

11  provision of the Comp Plan.

12                    **3.      XCare's Past Performance Raises Triable Issues**

13         XCare's past performance shows that it did not enforce the terms of the contract

14  upon which it now relies.  Specifically, XCare places great weight upon the terms of the

15  contract that provide that the company does not pay any commissions until the end of

16  the first month after the fiscal quarter in which the contract is signed.  *Def.'s Mem. P&A*

17  at 11:14-12:4  However, in this case, XCare paid McCollum commissions for the interim

18  contract in the second week of October.  McCollum Decl. ¶ 12; *Def.'s Mem P&A* at 5:5.

19  If XCare actually stood by the terms of the Comp Plan, then they would not have paid

20  McCollum anything, as she would not have been employed (in their view) by the end of

21  the month when payments were due.  She would have forfeited those commissions.

22  Thus, XCare's own conduct demonstrates that it does not even consistently comply with

23  the terms of the Comp Plan.  Accordingly, it cannot now hide behind these terms for its

24  own benefit.

25  ///

26         **C.      The Timing of McCollum's Termination and XCare's Actions Leading
                     to that Termination Raise Triable Issues as to McCollum's Claim that
27                   XCare Terminated Her so as to Retain the $558,782 Commission It**

28

**was About to Owe Her**

**1.     The Covenant Applies to XCare's Exercise of Discretion**

XCare simply misses the point of McCollum's claim for breach of the covenant of good faith and fair dealing.  In its motion, XCare confuses precedents dealing with implying an exception to at-will employment with the law implying good faith into a written contract that allows for one party to exercise discretion.  To be clear, McCollum is *not* arguing that her employment could only be terminated for cause.  Indeed, such an argument in this situation has been foreclosed by the California Supreme Court.  *Guz v. Bechtel Nat'l. Inc.*, 24 Cal.4th 317, 348-53 (2000).[7]  What McCollum *is* arguing is that XCare breached its obligation to act in good faith so as not to frustrate her ability to reap the specific benefit provided for under the relevant written contract: the Comp Plan.  *See id.* at 353 n. 18 (recognizing a valid covenant claim would exist where, as here, an at-will employee is terminated "as a mere pretext to cheat the worker out of another contract benefit. . ."); *see also* Complaint ¶¶ 39-42.

XCare seems to believe that the discretion it granted to itself under the Comp Plan permits it to act in any manner it wishes.  *See Def.'s Mem.* at 14:10-11.  California law unequivocally provides that XCare's belief is mistaken.  Every contract, including a contract that covers employee compensation, contains an implied-in-law covenant of good faith and fair dealing.  *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 683-84 (1988); *Locke v. Warner Bros., Inc.,* 57 Cal.App.4th 354, 363 (1997) (citations omitted).  Importantly, that covenant also applies to contracts that vest one party with discretion.  *Locke*, 57 Cal.App.4th at 363.  As the California courts have held,

_____

[7]Accordingly, XCare's cited authority is all misplaced.  Each of those cases addressed a plaintiff arguing that the covenant should act to override a written at-will provision in a contract.  *See e.g., Starzynski v. Capital Public Radio, Inc.*, 88 Cal.App.4th 33, 37-39 (2001) (holding that covenant cannot override specific written provision describing manner in which modifications to at-will status must be made); *Halvorsen v. Aramark Uniform Svcs.*, 65 Cal.App.4th 1383, 1387-90 (1998) (refusing to allow covenant to override express at-will provision in written contract).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT                                    16

"[W]here a contract confers one party with discretionary power affecting the rights of the other, *a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing.*"

*Id.*(quoting *Perdue v. Crocker Nat'l Bank,* 38 Cal.3d 915, 923 (1985)) (emphasis added).[8]  That covenant is a promise by each party to not "frustrate the other from enjoying benefits under the agreement to which the other is entitled."  *Kuhn v. Department of Gen'l Svcs.*, 22 Cal.App.4th 1627, 1637-38 (1994) (citations omitted); *see also Kelecheva v. Multivision Cable T.V. Corp.*, 18 Cal.App.4th 521, 531-32 (1993). Under California law, "what [the implied covenant of good faith and fair dealing] embraces is dependent upon the nature of the bargain struck between [the parties] and the legitimate expectations of the parties which arise from the contract."  *Commercial Union Assurance Cos. v. Safeway Stores, Inc.*, 26 Cal.3d 912, 918 (1980).  In gleaning the "legitimate expectations of the parties", California law requires that "[t]he whole of a contract is to be taken together, so as to give effect to every part, . . . each clause helping to interpret the other."  Cal. Civ. Code § 1641.

XCare spends considerable effort in declaring that the Comp Plan grants it unfettered discretion and that McCollum is attempting to add terms to the contract.  In so doing, XCare relies upon certain provisions of the Comp Plan.  However, XCare omits some key provisions from that discussion; provisions that, as required by California law, must be read together with the terms of the contract to determine the scope of the parties intent.  Cal. Civ. Code § 1641.  In particular, XCare fails to mention either section 1.1 or 1.2.

Section 1.1 of the Comp Plan declares the following:

The XCare.net Sales Incentive Compensation Plan has been developed for

---

[8]Thus, XCare's reliance on *Nager v. Allstate Ins. Co.*, 83 Cal.App.4th 284 (2000) is unfounded.  In that case, the court found that the defendant had acted reasonably and within the confines of its discretion under the contract.  83 Cal.App.4th at 291-93.  Thus, *Nager* simply affirms McCollum's stance that discretionary power must be exercised in good faith.

the purpose of increasing company sales productivity, revenue and profitability. The plan accomplishes these objectives by providing financial incentives for Plan Participants to meet and exceed goals applicable to their respective positions.

Blodgett Decl. Exh. B.

Section 1.2 of the Comp Plan further describes the "Plan Objectives" as follows:

Recognize and reward Plan Participants for their efforts associated with the production of the desired sales volume and margin.

Recognize and reward high-quality business transactions that enable revenue recognition by having the desired standard payment terms.

*Id.*

When the contract is properly read as a whole, it becomes clear that the agreement contemplates that XCare will exercise its discretion consistent with its promise to provide sales representatives with an incentive compensation arrangement that offers them an opportunity to ear unlimited commissions when the "meet and exceed goals applicable to their respective positions." Thus, it is a reasonable expectation of an XCare employee under this plan that they will be rewarded "for their efforts associated with the production of the desired sales volume and margin." Accordingly, the covenant of good faith and fair dealing places limits on XCare's exercise of discretion.

**2.      XCare Breached the Covenant**

The record shows that XCare acted in bad faith in terminating McCollum's employment. First, there is direct evidence that XCare was motivated by its desire to ensure that the company retained the benefit of the commissions that were going to McCollum. In his Friday, October 6 email, Pianko showed his true intent for terminating McCollum: "cost cutting." Lebowitz Decl. Exh E.   He specifically commanded that McCollum be terminated no later than close of business, Wednesday, October 11. *Id.* He made that command because he was "shooting for a Thursday signing." *Id.* Exh. K. Thus, there is direct evidence that XCare was motivated by its desire to cheat McCollum out of her commissions.

Second, XCare's allegation of poor performance by McCollum is nothing more than a mere pretext for cheating her out of the commissions that she was about to attain under the Technology Partnership Contract.  The record shows that the allegation of poor performance advanced by XCare is a fabrication, and done in bad faith.

In direct contradiction to XCare's interrogatory responses, Pianko testified that Velasquez never complained about McCollum's performance.  *Compare* Lebowitz Decl. ¶ 11 & Exh. J *with* Pianko Depo 23:4-9, 182:7-11.  The only relevant statement was attributed to Amitaubh Dutt, the director of the LAPS division of NVG/FHS.  However, XCare deliberately misinterpreted Dutt's words and intent.  Dutt merely stated that he did not need to have any sales team members making contact with him; that he was already sold on the project and only needed to maintain contact with the technical folks at XCare.  Dutt Depo 16:19-19:14.   In other words, McCollum had successfully done her job – he was sold.  Dutt had absolutely no complaints about McCollum's performance.  *Id.* Dutt also had no intent, or authority, to speak on behalf of FHS as a whole.  *Id.*

Moreover, any contention that McCollum was not adequately performing her job is ludicrous.  Though McCollum was never given a performance review, the Comp Plan provides an objective basis for assessing her performance.  As part of her Comp Plan, McCollum was assigned a quota of $1.25 million for sixth months that remained in the year 2000.  Blodgett Decl.  Exh. B at Attachment A.[9]  As the Comp Plan states: "Sales attainment of 70% of sales quota during the first full year on sales quota is considered minimum acceptable performance.  In subsequent years, attainment of 100% of quota is minimum expected level of performance."  *Id.* at § 1.7.  Based on the contracts that were signed between XCare and FHS in 2000, McCollum exceeded her full quota number – not to mention her 70% expectation – by at least a multiple of five.  Lebowitz

---

[9]The quota is listed at $2.5 million, but it is prorated to $1.25 million to match her start date of July 5, 2000.  *See* Harrison Decl. Exh. A.

1   Decl. Exh J (Response to Interrogatory No. 6); Harrison Decl. ¶ 2 & Exh. A.  Indeed, her

2   performance was so strong that she would have become eligible for the Presidents

3   Club.  Blodgett Decl. Exh. B at § 3.4

4   In the end, "[w]hether [XCare] violated the implied covenant and breached the

5   contract . . . is a question for the trier of fact."  *Locke*, 57 Cal.App.4th 354.

6   **D.   XCare Fails to Substantively Address McCollum's Labor Code Claim**

7   In its motion, XCare baldly states that "[f]or all the above reasons", McCollum

8   cannot state a claim under the California Labor Code.  This statement is flawed.  First,

9   this "mere assertion" cannot carry XCare's burden on summary judgment.  *Celotex,* 477

10  U.S. at 323; 11 *Moore's Fed. Prac.*, at § 56.13[1].  Second, XCare fails to address the

11  various substantive provisions of the California Labor Code.

12  The California Labor Code defines "wages" to include commissions.  Cal. Labor

13  Code § 200(a); *see also Hudgins v. Neiman Marcus Group, Inc.,* 34 Cal.App.4th 1109,

14  1118; *First Nat'l Bank of Vista v. Hellen*, 392 F.2d 58, 59 (9th Cir. 1968).  Moreover, at

15  the termination of an employee, all wages earned and unpaid become due and payable

16  immediately.  *Id.* § 201.  The employer has no more than 72 hours after the employee's

17  discharge to make that payment.  *Id.*[10]  Willful failure to pay any such earned wages

18  subjects the employer to statutory penalties.  *Id.* § 203.  The Labor Code's definition of

19  the term "willful" is *not* akin to the definition of that term when used generally to

20  determine liability for punitive damages.  *Barnhill v. Robert Saunders & Co.*, 125

21  Cal.App.3d 1, 7-8 (1981) ("the employer's refusal to pay need not be based on a

22  deliberate evil purpose to defraud workmen of wages. . .")  Instead, "willful" merely

23  means that the employer has intentionally (*i.e.*, not as a result of inadvertent oversight)

24

25

26

27  [10]The same time period and employer obligations apply if the employee resigns.  *Id.*

28  § 202.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT                                    20

1   withheld wages after termination of an employee.  *Id.*[11]

2      XCare argues that McCollum did not "earn" her commission because she was

3   not employed when the Technology Partnership Contract was signed.  However, the

4   only reason McCollum was not employed at the time was because of XCare's tortious

5   actions, aimed squarely at denying her the commissions that she had labored for.  But

6   for XCare's tortious actions, McCollum would have been employed at the time of

7   signing.  *See California Division of Labor Standards Enforcement Policies and*

8   *Interpretations Manual*, § 17.6 (Oct. 1998) ("Exceptions abound where the termination is

9   not a quit but a discharge.  In that case, *the employee has been prevented from*

10  *completing the duties* and may be able to recover all or a prorata share of the

11  commissions.  (O.L. 1993.03.08)" (emphasis added).).[12]  Accordingly, McCollum has

12  raised a triable issue as to her Labor Code claim.

     **E.   XCare's Refusal to Pay McCollum Her Commission on the Technology Partnership Contract Constitutes an Unfair Business Practice That Should Result in the Disgorgement of the Commission Proceeds Retained by XCare**

16      California's Unfair Competition Law ("UCL") prohibits businesses from engaging

17  in "any unlawful, unfair or fraudulent business act or practice. . ."  Cal. Bus. & Prof.

18  Code § 17200.  The scope of this prohibition is intentionally broad.  *Cel-Tech*

19  *Communic., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999).  Indeed, it

20  is "sweeping, embracing anything that can properly be called a business practice and

21  that at the same time is forbidden by law."  *Id.* (citations and quotation marks omitted).

22  UCL violations are found in two ways: (1) by "borrowing" violations of other statutes, or

[11]Notably, there is no "good faith" defense.  If the trier of fact believes that there is substantial evidence to support McCollum's position, then XCare will be liable for the penalty provisions of section 203.  *Id.* (citing *Davis v. Morris*, 37 Cal.App.2d 269, 274 (1940).)

[12]For the convenience of the Court, this provision of the DLSE manual is attached to the Lebowitz Declaration at Exhibit L.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

21

(2) by finding that a particular business practice is "deemed unfair even if not specifically proscribed by some other law." *Id.* at 180 (citations omitted).

### 1. Because XCare's Actions Violate the California Labor Code, They Also Violate the UCL

It is well-settled California law that failure to comply the California Labor Code's wage provisions also provide a basis for a violation of the UCL. *Cortez v. Purolater Airfiltration Prod. Co.*, 23 Cal.4th 163, 168 (2000); *Hudgins v. Neiman Marcus Grp., Inc.*, 34 Cal.App.4th 1109, 1126-27 (1995). As set forth above, McCollum has raised a triable issue as to her claim for violation of the California Labor Code. *See, supra*, § V.D. Borrowing from that claim, she has raised a triable issue as to her UCL claim.

### 2. XCare's Forfeiture Practice is also "Unfair" and Therefore Violates the UCL

The UCL "makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law." *Cel-Tech*, 20 Cal.4th at 180. As the California Supreme Court acknowledged, "[T]he Legislature . . . intended by this sweeping language to permit tribunals to enjoin ongoing wrongful business conduct in whatever context such activity might occur." *Id.* (citation omitted). Thus, the Supreme Court held, the UCL's definition of "unfair" is flexible and dependent upon the particular allegations of a claim. *Cel-Tech*, 20 Cal.4th at 186-87 & n.12 (defining "unfair" in context of facts of that case, but specifically limiting its holding to those facts.). Since *Cel-Tech*, no California published decision has addressed the definition of "unfair" in the current context. However, this Court is guided by the fact that the UCL is a law drawing on the court's powers sitting in equity. *Id.* at 180-81; *see also* Cal. Bus. & Prof. Code § 17203 (providing only equitable remedies for violations). Thus, this Court can draw on its equitable powers in this case to find that XCare's conduct – retaining the substantial monetary benefit that was earned by McCollum's tirelessly working on the FHS account – is unfair under the UCL.

XCare's Comp Plan calls for forfeiture of wages earned by an employee should

that employee resign their employment or be terminated.  Blodgett Decl. Exh. B, §§ 1.5 ("otherwise deferred commission payments that have not been distributed to Plan provisions will be forfeited."), 4.5 ("Any deferred commissions or bonuses not paid as of the employee's date of termination, are forfeited, regardless of the years commissions were earned.").  Indeed, in its motion, XCare emphasizes this point.  *Def.'s Mem P&A* at 9:12-10:11, 11:14-12:4.  There should be no doubt but that this forfeiture provision is entirely "unfair" in the present situation.

One of XCare's motivating factors in hiring McCollum was to work on the FHS account.  McCollum Depo 99:21-100:21.  As soon as she started with XCare, she began working tirelessly to reap the most possible revenue out of the account.  McCollum Decl. ¶ 8.  To that end, she drafted the first version of the Technology Partnership Contract.  Cangarlu Depo 40:20-42:7; McCollum Decl. ¶ 6.   Then, McCollum spent the majority of her employment with XCare tending to the multi-headed beast that the contract became.  *See supra* § III.A.1.  With all the various working parts and personalities involved, it was a very unruly process.  Nevertheless, McCollum coordinated ("drove") the contract negotiations to her very last day. Ultimately, it was not her fault that the contract was not signed on September 22 (the record shows that everyone at XCare expected it to happen then), rather it was FHS' Velasquez' last minute change of heart that caused the delay.  Despite these herculean efforts, XCare conspired to ensure that it did not have to pay out any commissions to McCollum, and sought to enforce the Comp Plan's forfeiture provisions to retain the benefit of what it believed to be in excess of $570,000.  *See supra* § III.A.3-4.  This complete forfeiture provision does not provide for any allocation for work done or efforts put forth in attaining a signed contract.

A claim under the UCL looks squarely to the court's equitable powers whereby the plaintiff may recover ownership of ill-gotten gains.  *Cortez*, 23 Cal.4th at 173; *see also* Cal. Bus. & Prof. Code § 17203.  In this case, XCare used the Comp Plan's

1   forfeiture clause to retain the entirety of McCollum's commissions.  A trier of fact could

2   easily find that such a practice is unfair under the UCL, thus, summary judgment is not

3   appropriate.

4   **F.     McCollum's Public Policy Claim Falls Squarely Within California Law**

5          "Of course, a tort cause of action for wrongful termination in violation of public

6   policy is now well established in California."  *Pettus v. Cole*, 49 Cal.App.4th 402, 453

7   (collecting cases).  Moreover, "the prompt payment of wages due an employee is a

8   fundamental public policy of this state."  *Gould v. Maryland Sound Indus., Inc.*, 31

9   Cal.App.4th 1137, 1147 (1995).  An action for wrongful termination in violation of public

10  policy "will lie 'wherever the basis of the discharge contravenes a fundamental public

11  policy.'"  *Id.* (quoting *Soules v. Cadam, Inc.*, 2 Cal.App.4th 390, 401 (1991).)  "The tort of

12  wrongful discharge is committed if the employee is terminated for 'a *purpose* that

13  contravenes fundamental public policy.'"  *Id.* at 1148 n.3 (quoting *Gantt v. Sentry Insur.*,

14  1 Cal.4th 1083, 1094 (1992) (emphasis in original).)

15         The record in this case shows that XCare's purpose in terminating McCollum was

16  to avoid paying her commissions on the Technology Partnership Contract.  *See supra* §

17  III.A.3-III.B.  McCollum's termination came out of the blue; she had been given no

18  indication whatsoever that she was going to be terminated.  When the signing date for

19  the Technology Partnership Contract was delayed, XCare acted quickly.  On Friday,

20  October 6, Pianko announced to senior management that McCollum was to be

21  terminated – for "cost cutting" reasons – no later than Wednesday, October 11.  At the

22  same time, Pianko was "shooting for a Thursday signing" of the Technology Partnership

23  Contract.  Thus, the record shows that "a purpose" of XCare's actions was to cheat

24  McCollum out of her commissions.  *See also supra* § V.C.2.

25         XCare's attempt to distinguish *Gould* is meritless.  Specifically, XCare places

26  great weight on the fact that the plaintiff in *Gould* had "earned" the disputed

27  commissions, while McCollum allegedly has not actually "earned" her commissions.

28

There are several things wrong with this attempted distinction.  First, as stated above in regard to the breach of contract claim, it is not at all clear from the contract what it means to "earn" commissions.  Second, even if XCare's reading is followed, an employer cannot benefit from taking specific actions to prevent an employee from earning commissions if its motivation was to retain the benefit of that money.

Accordingly, McCollum has raised a triable issue as to her public policy claim.

### G.   McCollum Has Raised a Triable Issue as to Her Declaratory Relief Claim

The California Code of Civil Procedure provides that a party to a written contract may bring a cause of action seeking a judicial determination of the rights of the respective contracting parties.  Cal. Code Civ. Proc. § 1060.  This remedy is cumulative to all other causes of action, even though the other claims may deal with the same contract.  *Id.* § 1062; *see also Southern Cal. Edison, Co. v. Superior Court*, 37 Cal.App.4th 839, 847 (1995).

For all the reasons set forth in regard to McCollum's claim for breach of contract, (*supra* § V.B.)  the record shows a triable issue as to her declaratory relief claim.

## VI.   CONCLUSION

XCare has submitted no admissible evidence to support its version of events or its purportedly undisputed facts.  Despite XCare's attempts to misconstrue and mischaracterize McCollum's claims, the record shows triable issues of fact as to each of McCollum's causes of action.


Dated: March 29, 2002                          McGUINN, HILLSMAN & PALEFSKY
                                               Attorneys for Plaintiff Anne McCollum


                                               _____/s/_____
                                               NOAH D. LEBOWITZ